UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JACK KALKMAN,

                Plaintiff,                                         Hon. Robert Holmes Bell

v.                                                     Case No. 1:10-CV-1058

COMMISSIONER OF SOCIAL
SECURITY,

                Defendant.

_____/


## REPORT AND RECOMMENDATION

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C.

§ 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim

for Disability Insurance Benefits (DIB) under Title II of the Social Security Act.  Section 405(g)

limits the Court to a review of the administrative record, and provides that if the Commissioner's

decision is supported by substantial evidence, it shall be conclusive.  Pursuant to 28 U.S.C. §

636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and

recommendations for disposition of social security appeals, the undersigned recommends that the

Commissioner's decision be **reversed and this matter remanded for further factual findings**

**pursuant to sentence four of 42 U.S.C. § 405(g)**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988).  The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence.  *See* 42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted).  It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993).  In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted).  This

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 48 years of age on the date of the ALJ's decision. (Tr. 19, 113). Plaintiff successfully completed high school and worked previously as a construction worker, construction foreman, and construction business owner. (Tr. 33, 136, 144-48).

Plaintiff applied for benefits on August 28, 2007, alleging that he had been disabled since August 16, 2007, due to an aortic aneurysm. (Tr. 113-15, 135). Plaintiff's application was denied, after which time he requested a hearing before an Administrative Law Judge (ALJ). (Tr. 60-112). On October 23, 2009, Plaintiff appeared before ALJ Randolph Schum, with testimony being offered by Plaintiff and vocational expert, Diana Wong. (Tr. 12, 31-59). In a written decision dated December 23, 2009, the ALJ determined that Plaintiff was not disabled. (Tr. 12-19). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 1-5). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## RELEVANT MEDICAL HISTORY

On March 25, 2005, Plaintiff reported to the hospital complaining of chest pain.  (Tr. 460).  A CT scan revealed "dissection of the ascending, transverse and descending aorta."[1]  (Tr. 388).  The following day, Dr. Edward Murphy performed an aortic root replacement and aortic valve replacement.  (Tr. 388-89).

On August 1, 2006, Plaintiff was examined by Dr. G. Michael Deeb, Professor of Surgery, Section of Cardiac Surgery, at the University of Michigan.  (Tr. 182-83).  Plaintiff reported that "over the past several months, he has been noticing a pain up into his neck and into his jaw" as well as "some light-headedness and some visual disturbances."  (Tr. 182).  Plaintiff reported that he usually experiences these pains "with activity."  (Tr. 182).  The results of a physical examination were unremarkable.  (Tr. 182-83).  The results of an August 29, 2006 bilateral carotid duplex scan revealed no evidence of "significant disease."  (Tr. 175).  The results of a bilateral lower extremity arterial doppler exam, performed the same day, were "within normal limits."  (Tr. 176).  Dr. Deeb concluded that:

> The summary of these tests shows that Mr. Kalkman has no major physiologic complication remaining from his anatomic chronic type B dissection...his carotid Dopplers reveals no significant disease, have good flow velocities, and good perfusion.  His cardiac catheterization shows angiographically normal coronary arteries, normal filling pressures, and no pulmonary hypertension...his pulmonary functions are completely normal. It is my impression that Mr. Kalkman has a chronic dissection beginning at the level of the innominate artery down through the bifurcation of his aorta...I discussed with Jack and his wife that there was no physiologic reason for the symptom secondary to his chronic dissection...I told him that

---

[1]  An aortic dissection "is a serious condition in which a tear develops in the inner layer of the aorta."  *See* Aortic dissection, available at http://www.mayoclinic.com/health/aortic-dissection/DS00605 (last visited on Feb. 2, 2012).  Blood "surges through this tear into the middle layer of the aorta, causing the inner and middle layers to separate (dissect)."  This can result in a fatal rupture of the aorta if not timely detected and treated.  *Id.*

> the symptoms he was feeling in the posterior portion of his neck and to his back may be because of the way[ he is] holding his neck back in thorax status post his open-heart surgery. A lot of time patients guard and protect their anterior sternum by tensing their back and posterior neck muscles to take the pressure off the anterior sternum and this becomes a habit with them causing this type of pain and tension. I tried to allay the fears of the Kalkman's and let them know that he is physiologically functioning normally and there is no major process going on inside that is alarming. Although he has a chronic type B dissection, he is perfusing all of his organs well. It is not aneurysmal and there is no indication that he has had significant risk with this.

(Tr. 173-74).

On January 23, 2007, Plaintiff participated in a CT scan of his thorax the results of which revealed a "stable thoracic aortic dissection." (Tr. 272). Following a February 19, 2007 examination, Dr. Murphy reported that Plaintiff "continues to do well." (Tr. 270). On February 23, 2007, Plaintiff participated in an echocardiograph examination the results of which were unremarkable. (Tr. 268-69).

On July 6, 2007, Plaintiff was examined by Dr. J. Robert Grove. (Tr. 255-56). Plaintiff reported that he was experiencing fatigue and "intermittent chest discomfort." (Tr. 255). Plaintiff did acknowledge, however, "working an average of 11- hour days." (Tr. 255). Plaintiff exhibited elevated blood pressure, but otherwise the results of a physical examination were unremarkable. (Tr. 255-56). Plaintiff was advised to undertake certain "lifestyle changes" such as "developing a routine exercise program" and accomplishing "moderate weight loss." (Tr. 256). Plaintiff was also instructed to "reduce his stress at work, such as taking a less physically active role...and taking a walk at lunch time." (Tr. 256). Plaintiff was also instructed to stop smoking. (Tr. 256).

On August 20, 2007, Plaintiff participated in a CT examination of his thorax the results of which revealed "stable appearance of the thoracic aorta with no evidence of pulmonary thromboembolism." (Tr. 470).

On September 10, 2007, Plaintiff completed a report regarding his daily activities. (Tr. 152-59). Plaintiff reported that he spends several hours each day "cleaning up antiques" which he sells on eBay and spends his afternoons "on the computer." (Tr. 152). Plaintiff reported that he feeds and waters his horses and goats daily and cleans their stalls "as needed." (Tr. 152-53). Plaintiff reported that "some days" he mows the lawn and does yard work. (Tr. 152). Plaintiff reported that he spends his evenings watching television. (Tr. 152). Plaintiff reported that he prepares his own meals, drives a car, shops, and can lift up to 40 pounds. (Tr. 154-57).

On October 22, 2007, Plaintiff participated in a consultive examination conducted by Joseph Bechard, Ed.S. (Tr. 223-26). Plaintiff reported that he was experiencing weakness in his lower extremities as well as pain in his neck, chest, and back. (Tr. 223). Plaintiff also reported experiencing anxiety and insomnia. (Tr. 223). With respect to his activities, Plaintiff reported that he feeds his horses and "fool[s] around with eBay or go[es] to antique shows." (Tr. 224). Plaintiff also reported that he refinishes furniture. (Tr. 224). The results of a mental status examination were unremarkable. (Tr. 224-25). Plaintiff was diagnosed with mood disorder and anxiety disorder and his GAF score was rated at 65.[2] (Tr. 225).

On November 15, 2007, Plaintiff was examined by Dr. Sean Growney. (Tr. 285). Plaintiff reported that he was "daily" experiencing "incapacitating" chest pain which radiates into

---

[2] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 30 (4th ed. 1994). A score of 65 indicates that the individual is experiencing "some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.* at 34.

his left arm and neck.  (Tr. 285).  The doctor observed that Plaintiff has "had a full diagnostic work-up, which has failed to reveal a cause of [Plaintiff's] pain."  (Tr. 285).  An examination revealed that Spurling's maneuver[3] was negative and Plaintiff's upper extremities exhibited no signs of muscle atrophy, skin discoloration or edema.  (Tr. 285).  Plaintiff was prescribed medication to treat his pain.  (Tr. 285).

On November 21, 2007, Plaintiff participated in an MRI of his cervical spine the results of which revealed minimal to mild disc bulging with "no evidence of any significant central canal stenosis."  (Tr. 489-90).  The results of an MRI examination of Plaintiff's thoracic spine, performed the same day, revealed "no evidence of any significant central canal stenosis or neural foraminal encroachment."  (Tr. 489-90).

On January 9, 2008, Plaintiff participated in an electroneuromyography examination the results of which were "essentially normal" with "no electrophysiologic evidence of a peripheral polyneuropathy."  (Tr. 287-89).  Likewise, there was "no obvious evidence of a named mononeuropathy, brachial plexopathy, or cervical radiculopathy affecting the left upper extremity" and "no evidence of a named mononeuropathy or lumbosacral radiculopathy affecting the left lower extremity."  (Tr. 289).  On February 4, 2008, Plaintiff participated in a CT scan of his thorax and abdomen the results of which revealed a "slowly progressive aneurysmal change of the descending thoracic aorta."  (Tr. 380-81).  On March 12, 2008, Plaintiff participated in a transthoracic echocardiogram the results of which were unremarkable.  (Tr. 383).

---

[3] A positive Spurling's test suggests the presence of a cervical nerve root disorder.  Thomas W. Woodward, M.D., and Thomas M. Best, M.D., Ph.D., *The Painful Shoulder: Part I Clinical Evaluation*, American Family Physician, May 15, 2000, *available at*, http://www.aafp.org/afp/20000515/3079.html (last visited February 2, 2012).

On October 7, 2008, Plaintiff was examined by Dr. Raymond Gonzalez. (Tr. 545-47). Plaintiff reported that he experiences thoracic pain, fatigue, weakness, and pain in his left upper extremity. (Tr. 545). The results of an examination were "unremarkable" and the doctor concluded that he "cannot see a pattern indicative of an autoimmune connective tissue disease, systemic rheumatic disease, or vasculitis syndrome." (Tr. 545-47).

On October 22, 2008, Dr. William VanderVliet completed a report regarding Plaintiff's physical ability to perform work-related activities. (Tr. 398-401). The doctor reported that during an eight-hour work day with normal break periods, Plaintiff can walk for one hour and sit/stand for seven hours. (Tr. 398). The doctor reported that Plaintiff can frequently lift 10 pounds and occasionally lift 25 pounds. (Tr. 398). The doctor reported that Plaintiff can frequently perform grasping and fine manipulation activities with his right upper extremity and can occasionally engage in such activities with his left upper extremity. (Tr. 399). The doctor reported that Plaintiff can never climb ladders but can occasionally bend, twist, reach above shoulder level, squat, kneel, crouch, crawl, and stoop. (Tr. 399).

On November 11, 2008, Dr. Robert Grove completed a report regarding Plaintiff's physical ability to do work-related activities. (Tr. 394-97). The doctor reported that during an eight-hour work day with normal break periods, Plaintiff can sit for eight hours, stand for one hour, walk for two hours, and sit/stand for two hours. (Tr. 394). The doctor reported that Plaintiff can frequently lift/carry five pounds and can occasionally lift/carry 20 pounds. (Tr. 394). The doctor reported that Plaintiff experienced no limitations in his ability to perform grasping or fine manipulation activities with his upper extremities. The doctor reported that Plaintiff can never crawl

but can frequently reach above shoulder level and can occasionally bend, twist, squat, kneel, crouch, stoop and climb stairs. (Tr. 395).

On November 12, 2008, Dr. Growney completed a report regarding Plaintiff's physical ability to perform work-related activities. (Tr. 390-93). The doctor reported that during an eight-hour work day with normal break periods, Plaintiff can sit for one hour, stand for 30 minutes, walk for 30 minutes, and sit/stand for two hours. (Tr. 390). The doctor reported that Plaintiff can frequently lift up to 20 pounds and can occasionally lift up to 50 pounds. (Tr. 390). The doctor reported that Plaintiff can occasionally perform simple grasping and fine manipulation activities with his upper extremities. (Tr. 391). The doctor reported that Plaintiff can never squat or reach above shoulder level but can occasionally bend, twist, crouch, crawl, stoop, and climb stairs. (Tr. 391).

On November 26, 2008, Plaintiff participated in a CT examination of his abdomen and thorax the results of which revealed "stable appearance of the thoracic aortic dissection with no acute dilation." (Tr. 475-76). On November 27, 2008, Plaintiff participated in a nuclear stress test the results of which were "normal" with "no significant reversible defect seen to suggest ischemia." (Tr. 506).

On January 28, 2009, Plaintiff participated in a CT examination of his chest and abdomen the results of which revealed: (1) "no change in the thoracic aortic aneurism and dissection"; (2) "post-operative changes from repair of the ascending aorta"; and (3) very small abdominal aortic aneurism...not significantly changed from 2006." (Tr. 504).

On February 4, 2009, Plaintiff was examined by Dr. John Heiser. (Tr. 508). Plaintiff reported that he "continues to have difficulty with back pain," but "walks up to a mile at a time

without any significant shortness of breath or angina." (Tr. 508).  Plaintiff was again encouraged to stop smoking. (Tr. 508).  Treatment notes dated March 27, 2009, indicate that Plaintiff "has lost significant weight" and "feels okay." (Tr. 518).  On May 14, 2009, Plaintiff participated in an echocardiogram examination the results of which revealed that his left atrium was "severely enlarged" with "no evidence of mass." (Tr. 560).  The results of this examination were otherwise unremarkable. (Tr. 560-61).

On May 20, 2009, Plaintiff was examined at West Michigan Heart. (Tr. 557-59). Plaintiff reported that he "continues to have intermittent chest discomfort same as before only more intense." (Tr. 557).  Plaintiff reported however that he "exercises daily including chopping wood and landscaping" but "keeps to a 40 [pound] weight limit." (Tr. 557).  The results of a physical examination were unremarkable and it was noted that Plaintiff had lost nearly 70 pounds since July 2007. (Tr. 557-58).

At the administrative hearing, Plaintiff testified that since he stopped working he has tried to keep busy, but that his chest and back pain and lower extremity weakness limits what he is able to do. (Tr. 35).  Plaintiff testified that he attempts to perform yard work occasionally, but that "things go very slow." (Tr. 36, 41-42).  Plaintiff made clear, however, that he does not perform any "heavy lifting." (Tr. 36).  With respect to animal care, Plaintiff testified that he will throw food to the horses, but that he no longer is able to clean out their stalls. (Tr. 36).  As for chopping wood, Plaintiff testified that he "used to take a couple of swings at some wood for about 10 minutes a day, but [does not] do that anymore." (Tr. 36).  Plaintiff testified that the previous winter was the last time he even attempted to chop wood. (Tr. 36).  Plaintiff also testified that he is no longer able to buy and sell antiques through eBay. (Tr. 40).  Plaintiff testified that because of his impairment and

symptoms he experiences both good days and bad days.  (Tr. 42).  Plaintiff testified that on a good

day he tries to stay busy performing light activities around the house for a few hours after which he

has to lay down for several hours.  (Tr. 42-43).  Plaintiff testified that on a bad day he might "read

a little bit," but otherwise has to "be quiet" and "sit quietly."  (Tr. 45).  Plaintiff testified that he

experiences "probably three good days" each week.  (Tr. 44).

## ANALYSIS OF THE ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating

disability.  *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[4]  If the Commissioner can make a

dispositive finding at any point in the review, no further finding is required.  *See* 20 C.F.R. §§

404.1520(a), 416.920(a).   The regulations also provide that if a claimant suffers from a

nonexertional impairment as well as an exertional impairment, both are considered in determining

his residual functional capacity.  *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders,

and he can satisfy his burden by demonstrating that his impairments are so severe that he is unable

---

[4] 1.   An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2.   An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3.   If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4.   If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5.   If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

11

to perform his previous work, and cannot, considering his age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy.  *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.  While the burden of proof shifts to the Commissioner at step five of the sequential process, Plaintiff bears the burden of proof through step four, the point at which his residual functioning capacity (RFC) is determined.  *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that Plaintiff suffers from: (1) residuals of aortic resection; (2) idiopathic back pain; and (3) leg weakness, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1.  (Tr. 14-15). With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform work subject to the following limitations: (1) he can lift 10 pounds occasionally and less than 10 pounds frequently; (2) he can stand and/or walk for two hours during an 8-hour workday; (3) he cannot climb ladders, ropes, or scaffolds; and (4) he can occasionally balance, stoop, kneel, crouch, crawl, and climb stairs/ramps.  (Tr. 15-16).

The ALJ determined that Plaintiff could not perform his past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, his limitations notwithstanding.  *See Richardson*, 735 F.2d at 964.  While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a

claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Diana Wong.

The vocational expert testified that there existed approximately 71,000 jobs in the "national economy" which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 54-55). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

a.     The ALJ Properly Evaluated Plaintiff's Impairments

At step two of the sequential disability analysis articulated above, the ALJ must determine whether the claimant suffers from a severe impairment. Plaintiff asserts that the ALJ's decision must be reversed because he failed to find that he suffered from a severe neck impairment.

The Sixth Circuit has held that where the ALJ finds the presence of a severe impairment at step two and proceeds to continue through the remaining steps of the analysis, the alleged failure to identify as severe some other impairment constitutes harmless error so long as the

ALJ considered the entire medical record in rendering his decision.  *See Maziarz v. Sec'y of Health and Human Services*, 837 F.2d 240, 244 (6th Cir. 1987); *Anthony v. Astrue*, 266 Fed. Appx. 451, 457 (6th Cir., Feb. 22, 2008) (citing *Maziarz*, 837 F.2d at 244); *Fisk v. Astrue*, 253 Fed. Appx. 580, 583-84 (6th Cir., Nov. 9, 2007) (same).  Here, the ALJ determined that Plaintiff suffered from a severe impairment at step two of the sequential analysis and continued with the remaining steps thereof, considering in detail the medical evidence of record.  (Tr. 12-19).  Thus, even if the Court assumes that the ALJ erred in failing to find that Plaintiff suffered from a sever neck impairment, such does not warrant reversal of the ALJ's decision.

b.      The ALJ Improperly Discounted Plaintiff's Subjective Allegations

As described above, Plaintiff testified at the administrative hearing that he was impaired to an extent well beyond that recognized by the ALJ.  The ALJ concluded that Plaintiff's subjective allegations "are credited to the extent that he is found to have had a physical residual capacity for no more than sedentary level exertion."  (Tr. 17).  Plaintiff asserts that the ALJ improperly discounted his subjective allegations.

As the Sixth Circuit has long recognized, "pain alone, if the result of a medical impairment, *may* be severe enough to constitute disability." *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984) (emphasis added); *see also*, *Grecol v. Halter*, 46 Fed. Appx. 773, 775 (6th Cir., Aug. 29, 2002) (same).  As the relevant Social Security regulations make clear, however, a claimant's "statements about [his] pain or other symptoms will not alone establish that [he is] disabled."  20 C.F.R. § 404.1529(a); *see also*, *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997) (quoting 20 C.F.R. § 404.1529(a)) *Hash v. Commissioner of Social Security*, 309 Fed.

Appx. 981, 989 (6th Cir., Feb. 10, 2009).  Instead, as the Sixth Circuit has established, a claimant's

assertions of disabling pain and limitation are evaluated pursuant to the following standard:

> First, we examine whether there is objective medical evidence of an
> underlying medical condition.  If there is, we then examine: (1)
> whether objective medical evidence confirms the severity of the
> alleged pain arising from the condition; or (2) whether the objectively
> established medical condition is of such a severity that it can
> reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531 (citations omitted).  This standard is often referred to as the *Duncan*

standard.  *See Workman v. Commissioner of Social Security*, 105 Fed. Appx. 794, 801 (6th Cir., July

29, 2004).

Accordingly, as the Sixth Circuit has repeatedly held, "subjective complaints may

support a finding of disability only where objective medical evidence confirms the severity of the

alleged symptoms."  *Id.* (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)).

However, where the objective medical evidence fails to confirm the severity of a claimant's

subjective allegations, the ALJ "has the power and discretion to weigh all of the evidence and to

resolve the significant conflicts in the administrative record."  *Workman*, 105 Fed. Appx. at 801

(citing *Walters*, 127 F.3d at 531).

In this respect, it is recognized that the ALJ's credibility assessment "must be

accorded great weight and deference."  *Workman*, 105 Fed. Appx. at 801 (citing *Walters*, 127 F.3d

at 531); *see also*, *Heston v. Commissioner of Social Security*, 245 F.3d 528, 536 (6th Cir. 2001) ("[i]t

is for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the

witnesses and weigh and evaluate their testimony").  It is not for this Court to reevaluate such

evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must

stand.  The ALJ found Plaintiff's subjective allegations to not be fully credible, a finding that should

not be lightly disregarded.  *See Varley v. Sec'y of Health and Human Services*, 820 F.2d 777, 780 (6th Cir. 1987).

   The rationale articulated by the ALJ for discrediting Plaintiff's subjective complaints does not survive even the most cursory examination.  The ALJ stated that "the claimant testified at the hearing that he regularly engages in significant physical activity, including yard work, cleaning out horse stalls, and chopping wood."  (Tr. 16).  This statement represents a complete misrepresentation of Plaintiff's testimony.  Plaintiff's actual testimony was that he tries to stay as busy as possible "working around [his] symptoms" of lower extremity weakness and chest and back pain.  (Tr. 35).  Plaintiff testified that he "tr[ies] to keep moving just for the therapy for [his] mind and for [his] body," but that he is significantly limited in what he can accomplish.  (Tr. 35).  As for yard work, Plaintiff testified that he will "pull weeds if [he] can contort to a lot of positions. . .for a few minutes."  (Tr. 35-36).

   With respect to taking care of his animals, Plaintiff testified that "once in a while" he throws grain to the animals.  (Tr. 36).  As for cleaning stalls, Plaintiff testified that he used to "lift a couple of little piles of manure, which probably amounts to ten pounds," but that he "don't even do that anymore."  (Tr. 36).  As for chopping wood, Plaintiff testified that he "used to take a couple of swings at some wood for about ten minutes a day, but I don't do that anymore either."  (Tr. 36).

   Plaintiff's testimony was essentially that he has made every effort to remain active and perform various activities, but that as his condition worsened his ability to perform physical activity diminished.  This is supported by the other evidence of record concerning Plaintiff's activities, as well as the medical record as a whole.

The ALJ also discredited Plaintiff's subjective allegations on the ground that "recent treatment records do not show that the claimant made comparable allegations regarding his activity level [i.e., that he was experiencing increased pain and impairment] to his treating physicians." (Tr. 16). While it would seem appropriate to perhaps discredit a claimant to the extent that his care providers reported matters that were inconsistent with the claimant's later testimony, it is a different matter altogether to discredit a claimant because records (completed by somebody other than the claimant) do not expressly confirm the claimant's testimony. The fact that Plaintiff's care providers did not include in their treatment notes comments about Plaintiff's activity level simply does not support the ALJ's conclusion that Plaintiff made no mention of such. There is no indication that Plaintiff was asked about such matters or that such information was relevant to the attempts by Plaintiff's care providers to diagnose and treat Plaintiff's impairments.

In sum, for the reasons articulated above, the Court finds that there does not exist substantial evidence to support the ALJ's decision to discredit Plaintiff's subjective allegations of pain and limitation.

c.      The ALJ Improperly Rejected the Opinions of Plaintiff's Treating Physicians

As detailed above, between October 22, 2008, and November 12, 2008, Drs. VanderVliet, Grove, and Growney completed reports in which they concluded that Plaintiff was impaired to an extent greater than that recognized by the ALJ. (Tr. 390-401). The ALJ rejected these opinions to the extent they conflicted with his RFC determination. Plaintiff asserts that because Drs. VanderVliet, Grove, and Growney were his treating physicians, the ALJ was obligated to accord controlling weight to their opinions.

17

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and his maladies generally possess significant insight into his medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). An ALJ must, therefore, "give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'" *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Wilson*, 378 F.3d at 544. In articulating such reasons, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *See* 20 C.F.R. §§ 404.1527, 416.927; *see also*, *Wilson*, 378

18

F.3d at 544. The ALJ is not required, however, to explicitly discuss each of these factors. *See, e.g.,*
*Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448,
450 (5th Cir., Jan. 19, 2007). Instead, the record must reflect that the ALJ considered those factors
relevant to his assessment. *See Oldham*, 509 F.3d at 1258; *Undheim*, 214 Fed. Appx. at 450.

      The ALJ rejected these opinions on two grounds: (1) the doctors "seem to uncritically
endorse [Plaintiff's] subjective complaints;" and (2) "the medical evidence of record does not seem
consistent with the degree of limitation" expressed by the doctors. (Tr. 17). This rationale likewise
fails to survive scrutiny.

      First, the ALJ identifies no evidence to support his conclusion that Plaintiff's doctors
"uncritically endorse[d]" Plaintiff's subjective complaints. Moreover, even if it is assumed that
Plaintiff's doctors did "uncritically endorse" Plaintiff's subjective complaints, such does not
necessarily support the conclusion that the doctors' opinions are, therefore, worthy of little weight.
To the extent that the doctors "uncritically endorse[d]" Plaintiff's subjective allegations, it is just
as likely that such was the case because Plaintiff's doctors found Plaintiff's subjective allegations
entirely credible and consistent with their findings. The ALJ's conclusion in this regard is nothing
more than speculation which does not constitute substantial evidence.

      As for the ALJ's conclusion that "the medical evidence of record does not seem
consistent with the degree of limitation" expressed by Plaintiff's doctors, the ALJ fails to identify
any "medical evidence of record" in support thereof. In this respect, the Court notes that the medical
evidence of record, if anything, supports the opinions in question. In sum, because the ALJ failed
to articulate "good reasons" for rejecting the opinions expressed by Drs. VanderVliet, Grove, and

Growney, the ALJ's decision to accord such opinions less than controlling weight is not supported by substantial evidence.

While the Court finds that the ALJ's decision fails to comply with the relevant legal standards, Plaintiff can be awarded benefits only if proof of his disability is "compelling." *Faucher v. Secretary of Health and Human Serv's*, 17 F.3d 171, 176 (6th Cir. 1994) (the court can reverse the Commissioner's decision and award benefits if all essential factual issues have been resolved and proof of disability is compelling). While the ALJ's decision fails to comply with the relevant legal standard, there does not exist *compelling* evidence that Plaintiff is disabled. As discussed herein, resolution of Plaintiff's claim requires the resolution of factual disputes which this Court is neither authorized nor competent to undertake in the first instance. The undersigned recommends, therefore, that the Commissioner's decision be reversed and this matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g).

d.      Plaintiff is not Entitled to a Sentence Six Remand

As part of his request to obtain review of the ALJ's decision, Plaintiff submitted to the Appeals Council additional evidence which was not presented to the ALJ. (Tr. 608-09). The Appeals Council received the evidence into the record and considered it before declining to review the ALJ's determination. (Tr. 1-5). This Court, however, is precluded from considering such material. In *Cline v. Commissioner of Social Security*, 96 F.3d 146 (6th Cir. 1996), the Sixth Circuit indicated that where the Appeals Council considers new evidence that was not before the ALJ, but nonetheless declines to review the ALJ's determination, the district court cannot consider such

evidence when adjudicating the claimant's appeal of the ALJ's determination.  *Id.* at 148; *see also*, *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007) (quoting *Cline*, 96 F.3d at 148).

        If Plaintiff can demonstrate, however, that this evidence is new and material, and that good cause existed for not presenting it in the prior proceeding, the Court can remand the case (pursuant to Sentence Six of 42 U.S.C. § 405(g)) for further proceedings during which this new evidence can be considered.  *Cline*, 96 F.3d at 148.  To satisfy the materiality requirement, Plaintiff must show that there exists a reasonable probability that the Commissioner would have reached a different result if presented with the new evidence.  *Sizemore v. Secretary of Health and Human Serv's*, 865 F.2d 709, 711 (6th Cir. 1988).

        The evidence in question consists of an August 16, 2010 letter authored by Dr. VanderVliet.  In this letter, the doctor states that on January 5, 2010, Plaintiff suffered a ruptured spleen and, furthermore, that the results of subsequent laboratory tests were "consistent with a diagnosis of chronic Lyme Disease."  While this evidence is not inconsistent with Plaintiff's subjective allegations, it is not reasonable to assert that consideration of this material by the ALJ *would* have led to a different result.  Accordingly, the Court is precluded from considering this evidence and, furthermore, there exists no basis for remanding this matter pursuant to Sentence Six.

<u>**CONCLUSION**</u>

        For the reasons articulated herein, the undersigned concludes that the ALJ's decision is not supported by substantial evidence.  Accordingly, the undersigned recommends that the Commissioner's decision be **reversed and this matter be remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C). Failure to file objections within such time waives the right to appeal the District Court's order.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date:  February 21, 2012                        /s/ Ellen S. Carmody
                                              ELLEN S. CARMODY
                                              United States Magistrate Judge

22